May it please the court, my name is Mike Holland. I represent the appellants in this case, Alice Hatzell, as guardian of her daughters Cheryl Hatzell and Richard Hatzell. This is an appeal that arises from the court's entry of summary judgment on the claims arising under the Emergency Medical Treatment and Active Labor Act. I want to start you right out if I might please, because how is it that we can consider this a failure to screen when the patient was examined, x-rays were performed, the urinalysis was ordered, although it was not completed, but isn't the breakdown in following through a medical malpractice issue rather than a failure to make a good faith effort to screen? Well, Your Honor, the initial presentation included a complaint by her mother that she had not been urinating, and that under the standards and protocols that Wisher would customarily use in evaluating a patient with that presentation, a urinalysis would be ordered, and the urinalysis would be completed, was expected to be completed by the nursing staff. That was not done, and the reasons for that not being done from the evidence are the fact that she was unable to urinate to provide a sample, which confirmed the presenting problem. So that's part and parcel of what an appropriate screening was based on what Wisher would do for patients presenting with similar complaints, and in this instance it was not done, which gives rise to the EMTALA claim for failing to appropriately screen. It's not that, it's not simply negligence, it looks to, and EMTALA looks to what is done for other patients under similar circumstances with similar complaints. Well, it seems to me that there, you know, there was no refusal to screen. There was no improper screening for discriminatory purposes or reasons. You know, if there had been all of that would fall under EMTALA, but many courts looking at the cases have held that negligence in the screening or diagnostic process or faulty screening are not EMTALA, but fall with medical malpractice, because that kind of behavior seems to raise issues of competence, but not issues of patient dumping or differential treatment. Your Honor, the cases that have looked at whether there's a requirement of proving a motive, an intent to dump the patient, or any discriminatory purpose, have consistently found that that is not a requirement under an EMTALA case. There's nothing in the statute itself. Almost consistently, right? There are outliers, but the courts which have considered it have rejected that as a requirement based on the fact that it's not part of the language of the statute. And the malpractice part of it typically involves a malpractice case is looking at what is done by reasonably prudent providers of the same specialty. It looks to questions of reasonableness under the circumstances, but the way that the cases have been interpreted on EMTALA, the standard is what was done for patients at this facility. It's not a prevailing standard of care. It looks at this facility. What did this facility typically do to provide an appropriate medical screening for patients presenting with these kinds of complaints? Excuse me. Let me ask the question this way. Your position sounds to me as though you read EMTALA as a statute that imposes liability on hospitals for failure to follow their own protocols in the emergency room, whatever those protocols may be. And I'm not sure that's what EMTALA does. Because you keep emphasizing, well, they said it had to be your analysis, so they should have followed through. And I understand that probably their standard protocol does call for your analysis. But it sounds to me like you think any time they don't follow their standard protocols, you've stated an EMTALA claim. I believe that's correct, Your Honor. Really? Okay. I didn't think that was your claim. I thought your claim was that if a doctor exercises medical judgment so as to depart from those protocols in one way or another, that's okay. A doctor could have said, oh, we don't need the urinalysis. But there's no evidence that that happened here. There's no evidence a medical judgment was made. Well, that's correct. I mean, this fact situation is distinguished from these cases that's cited in the district court's opinion. The Vickers case, the Summers case, in which the court found there was a medical judgment by the physician who was examining the patient. In Vickers, it was a head laceration. In Summers, it's chest trauma. The popping. Examination's done, and there's no need for x-rays. He made that medical decision, and the courts in those circumstances said, that's malpractice. That's decision-making, a question of reasonableness. But in our case, based on the information gained from the assessment of her when she came, the decision is made to order a urinalysis. So it's not a situation where there's a decision that she does not need a test. The test was ordered. It was not performed. And the non-performance of the test. Do you think that negligence in screening will always violate the EMTALA? No, because there's different standards. Negligence in screening, in terms of a malpractice case, would require elements of proving what's the standard of care, what do physicians do under similar circumstances, and what was done here. So you would say, just to clarify that, you would say if they went ahead and said they were doing a urinalysis, but they just grabbed the wrong kit or something, that would be negligence in screening. Not doing it at all is different. Is that your distinction? Well, not doing it at all is different, but on the second visit, they didn't do it at all. There was nothing ordered for evaluation of urinary tract problems. On the first visit, they ordered the urinalysis, but it wasn't done in a manner which was inconsistent. It emphasized the need for it. Exactly. The fact that it couldn't be done because she couldn't urinate. So confirming the presenting problem. And the bottom line is that she did not receive the screening that would have been provided to patients under similar circumstances, focusing on the evidence being what did they do. The deposition testimony relates to what did Wisher typically do under similar circumstances and was not focused on what's the prevailing standard of care, which raises questions of reasonableness, decision-making, discretion, and that's a different issue. Can I ask you a couple of questions, Mr. Holland? First of all, do I understand correctly your position is that while medical malpractice law under state law and EMTALA are different bodies of law, there can be instances of overlap, and you think this is one of them? Yes, Your Honor. That is, it's not a complete defense to just say, oh, you've got a remedy under medical malpractice. You have to look more closely. You have to look more closely. And then do you think we need to consider and decide separately about the May 29 visit and the May 30 visit? And if so, why or why not? Well, I don't think it's necessary to decide separately. They are tied together in the sense that when she comes back on the second visit, she has the same problem with not urinating. Is that doctor told that? Yes, he is. The family, when they arrive, she's brought by ambulance to the hospital, but when they arrive, the family does tell the physician that she is not urinating. And there's nothing done in response to that issue. That focused on her fall. Her broken nose, yeah. Correct, yes. Frankly, that's the easier one to understand in terms of what's focused on the trauma and not necessarily on potential underlying causes, but maybe that's a jury question from your point of view. I think it is a jury question. The circumstances here bearing on what was done for her, what's typically done, they're ripe with factual questions, and particularly in light of the defense position being, well, maybe there were reasons why we didn't do it here. They don't specify why, but sometimes we don't do it. We don't necessarily do the auditory analysis. But these are questions which call for the trier fact to consider all the evidence relating to the particular circumstances during these visits, which we believe creates issues of fact requiring it to be remanded to the district court. Okay. Thank you very much. Thank you. Mr. Babb. Opposing counsel? Madam Chief Judge, may it please the court. This court should affirm the district summary judgment order for two reasons. First, the undisputed evidence shows that Wishart Hospital provided Cheryl with appropriate medical screenings in exercising medical judgment and first diagnosing her with constipation, and then secondly, by screening her for injuries due to a fall. So can I ask you about that? Because I'm very bothered by particularly the screening on the first day, because it seems to me she presents not with one problem, constipation, but she presents with two problems, constipation and inability to urinate. And it seems to me your position is that any patient who presents with more than one problem has been adequately screened if only one of the problems is screened, because she certainly is not screened for the difficulty in urination. So, you know, if somebody shows up with a rash and a broken leg, you know, you get to look at the broken leg and not the rash. I don't know. I mean, there are all kinds of things. People can have more than one thing wrong with them, and it's not clear to me that screening is accomplished if they just pick one thing. Well, Your Honor, I think our position would not be. You show up, you have a rash, and you're pregnant. You know, I mean, what? Actually, I think this is really what the Summers Court went to address, and I think this sentence in the Summers Court decision kind of brings it to a head, where they stated that it would almost always be possible to characterize negligence in the screening process as non-uniform treatment. No, but I'm not there. I'm not asking how well they screened her or anything. I'm talking about the fact that when she shows up and they are told there are two problems, bowel and urine, and they do the X-ray, that's fine. You know, that tells them something about the bowel issue. But they don't do anything for the other problem, and we don't see anything in the record saying there was a medical judgment that this other thing didn't need to be screened. And so we don't screen for things that the doctors don't think. Obviously, this isn't a complete physical. You know, they don't need to screen people for everything. But if the standard protocol is that somebody who comes in with a urinary blockage problem at least gets a urinalysis, then she didn't get that. It just falls off the radar. Your Honor, I think that now, with the benefit of hindsight, they have been very focused on the urine system issue, but when she presented, she also had symptoms of constipation. This whole issue with the urinary tract system, it was arguably missed, and then that would be negligence. It would certainly be negligence to miss that, but I think when they order the urinalysis and they don't follow through after she tries for an hour to produce a sample, if there had been any kind of follow-up on that at all, very cheap. Somebody could have stuck a catheter into her or something. We're not talking about giant expense for the hospital or anything. An ultrasound, which also gets discussed somewhere in the medical testimony. Although there's a decision that she needs to be screened for this and that that's what Wisher does, they don't do it. And it's this, like, two problems wrong with you, both of which need screening, but we didn't do one of them. Your Honor, these are the exact same arguments that were made in Vickers. The exact same arguments that were made in Summers is that in Vickers, you came in, you had lacerations done ahead. What you should have done was all of this other stuff to identify that there was internal injuries in the cranium. But no, but the point is, did anybody order the rest of this stuff? The answer in Vickers is no, they didn't. Here it is ordered. It is ordered. And it's not done. Correct. And there's unrebutted evidence that a urinalysis is a test that was commonly ordered. It didn't necessarily mean that there was a problem with the urinary tract system. But you'll do blood tests, too, and you might not expect that there's going to be anything wrong, but the blood test reveals something. They ordered it, but they didn't do it. They didn't, Your Honor, and that at most is negligence. They made a mistake and they should have done so. But, again, this is the first time that this court has a chance to opine on the standard here. And at this court, as Judge Rodner noted in the opening, this is about this whole antipatient dumping act, EMTALA, is really about the failure to treat. Well, it used to be. I mean, initially, of course, that's what motivates its passage, but that's not what the language of the statute is limited to. But the standard that you're articulating, Your Honor, it will eviscerate any distinction between a medical malpractice action. No, I don't think so at all. Mr. Babb, could I ask a question? I don't believe that would be possible because there is overlap. Let me ask you this. If she had come to the emergency room complaining only of a failure to urinate, would you agree that the assessment here would implicate the EMTALA? I think that's a much closer call, and it might, in fact, be the case, Your Honor. So it was the existence of other conditions and the focus on some to the detriment of the other? Well, when she came in, she said— When she came in, she had complained. She said she had not had a bowel movement for four days, and she said she was in pain. And then the doctors asked her, what kind of medications are you on? And she said, I'm on medications that would lead to problems with constipation. So, again, instead of just shunting the patient off, they ordered an X-ray. They determined that she was constipated, and they gave her a laxative. Now, at the end of the day, that is not a failure to treat. In order to really uphold—I mean, I've heard a lot of discussion this morning about, let's just not talk about the language of the statute. Let's say what the purpose of the statute is. This, at its core, is an anti-dumping statute. This court recognized that in Beller. But I'm looking at the statute. It's just talking about a medical condition. The hospital must provide for an appropriate medical screening examination within the capability of the hospital's emergency department. Right. It's not talking about patient dumping, although we all remember the horrible stories that maybe led to this. It does, Your Honor. Again, the point in Summers was this, is that there will always be a non-negligent protocol that the hospital should have followed. That it ordered? That it would have followed. That it did order. That's the difference with this. That's why it's not negligent. No one is trying to tell the hospital what tests it should have ordered. All we're looking at is what it did order. So you're hung up with the fact that the urinalysis was ordered? Mm-hmm. Okay, again. Or that it was part of the standard protocol. And it's part of the standard protocol. And the mother, I know you resisted this at some point, but the district court takes the facts in the light most favorable to the non-moving party. They are alerted to the fact that she's not urinating. Now, not urinating is an unusual situation. It's something that requires some follow-up. Your Honor, if you look at the nurse Fishburn, she submitted an affidavit. And this whole issue, because the connection between, again, if somebody is diagnosed and treated for constipation and then comes in with a broken nose or suffers a fall and is diagnosed and treated for a broken nose, then the question becomes have we failed to treat them? Have we? Well, I'm not on failure to treat. I actually think this case is all about the screening. Okay, well, at the end of the day, then we have evidence that the screening, that this was part of what was normally ordered in this hospital. That's the evidence. So what you're saying is the hospital actually doesn't have a protocol that requires actually doing the tests that are ordered. What I'm saying is that It's okay to just sort of write down we're ordering this test or that test and not do it. Your Honor, what I'm saying is that there's no evidence in this record that this patient was ever diagnosed with a urinary system problem. And Nurse Fishburn, if I could, she said that based on my custom and practice, if I have a patient who cannot or will not provide a urine sample and a urine analysis has been requested, I will advise the physician and ask what the physician wants me to do. I've had physicians tell me that they believe they have found the cause of the problem that the urine sample is no longer necessary. If that is the case, I almost never document why the urine sample was not obtained. But that's guesswork. Nobody remembers this, right? Correct, Your Honor. But again, And that's jury material. But, Mr. Babb, could I ask you to address the Power and Cruz-Vezquez decisions, both of which seem to me pretty expressly to address this problem, about the difference between, in essence, negligent screening, misreading results, carrying out tests in the wrong way, and failing to do so? I think that the Power case is, again, that's a case that did find an EMTALA claim. And the idea there was that if a test has been ordered, and again, the urinalysis part here was just part of the standard protocol, but if a test has been ordered and it's part of their protocol but it doesn't lead to anything that would lead to further care, then it's hard to understand how the patient hasn't been treated appropriately. Perhaps I misunderstood you. I thought it was pretty clear, or at least on summary judgment, we have to assume that urinalysis or a follow-up blood test in the absence of an ability to produce any urine would have detected the kidney malfunctioning problems that became so much worse in the coming days. I think it might have been, Your Honor. But again, if they didn't do that and they didn't focus in on that, that would have been a mistake in a medical judgment. Okay. Well, I'm asking you to address Power and Cruz-Vazquez, which both say that failure to carry out needed tests amounts to an EMTALA violation. And, Your Honor, my response to that would be this. That case is inconsistent, and it would be a minority view of what most of the circuits that have decided this would say, Sorry, which other cases have dealt with failures to do the protocol? I'm not sure, but honestly, Your Honor, I'm not sure what protocol you're claiming that the hospital failed to follow. You tell me, or I'll ask the plaintiff on rebuttal. But I thought we at least have, in this case, an order to get a urine sample and analyze it. And I would think that in a hospital as good as Wishart and Eskenazi have been and continue to be, that a patient who cannot produce a urine sample and has not been urinating for several days, that that's going to draw medical attention. Believe me, I understand your point. This was not a total failure to treat, not even a total failure to screen appropriately. But there was a critical failure to screen. If we have a situation where there are maybe tests that were ordered, and they weren't done maybe at all, or they weren't done correctly. No, no, we have to distinguish correctly versus at all. Not done at all is the only thing we're talking about. And that would be negligence, Your Honor, and that is going to be a core part of their state medical malpractice lawsuit. What's the status of that? The status right now is, with respect to both presentations on the 29th and the 30th, I believe, and opposing counsel can correct me if I'm wrong, that there was the standard of care that was found not to be met on both of those situations. Can it be both a violation of the EMTALA and medical malpractice? I'm not aware, Your Honor, of anything that says it could not. But, again, if the court goes this way and the court finds that and plaintiffs are able to come in and say, here's all the things that you should have done, here's what you didn't do. And, again, this is a urinalysis. We need to understand that their claim on the urinalysis test is wrapped in the context of, you knew there was a problem with this system. There is no evidence at all in this record that this urinalysis was ordered to address the problem that they complained of. It's not there. Well, there is evidence. The evidence is that the mother reports that the daughter has not been urinating for a significant period of time. And people normally don't go 24 hours, much less longer than that, without urinating. Your Honor, there's that evidence? That's significant evidence. But, Your Honor, there's all kinds of evidence. And they order a test. I mean, that's what, to me, anyway, that's a very important fact. I'm not asking them to decide which test to order. They ordered the test. There's all kinds of evidence on what they were told. There's all kinds of evidence. But we have to take that for right now in the light most favorable to the plaintiffs. It may prove, you know, a jury may find otherwise. We understand that. They may have not been told anything. I mean, a jury may say, oh, they were completely silent about urinalysis, in which case that would be quite different for you. Without a context that any of these doctors believed that there was a problem with this urinary tract system, where the court is headed by finding an EMTALA claim here will always provide a dual mechanism for a state medical malpractice claim and an EMTALA claim. Okay. I do have one. May I? Sure. Can you articulate, Mr. Babb, a standard that you would propose for distinguishing medical malpractice claims for negligence screening from EMTALA claims? Can you do that? Here's the best that I can do, Your Honor. Judge McKinney, because I think really what this case turns on, which all the other circuits have tried to focus in on when they're trying to develop what their law is, is that how do you define appropriate screening mechanism? And in the Cleveland court, it's interesting because there the circuit said this is one of the best weasel words that legislators could use, right? Because obviously you don't want to do something that's inappropriate. So you do an appropriate screening mechanism. Here's what he said. A hospital satisfies EMTALA's appropriate screening mechanism requirement if it provides a patient with an examination comparable to the one offered to other patients presenting similar symptoms. I can tell you this, their position and the questions that I've heard from the court today, they are presupposing that somehow, some way, this hospital staff diagnosed a problem with the urinary tract system. Because that's the standard. If they diagnosed that, should they have followed through on the urinalysis? Of course they should have. And if they didn't, then they didn't get a comparable treatment. But you would not follow through on a urinalysis if you have only diagnosed constipation. The doctor came in and sat down and said, I think you're constipated. Here is medicine, a laxative, go home. The next day came in. She presented with broken bones from a fall. They diagnosed those with broken bones. They took x-rays. They took all kinds of tests. There is no evidence in this case at all that would allow you to moor some sort of an EMTALA claim in some sort of a problem with the urinary system. They just missed it. Okay. I think we have your point. Thank you very much. I think your time may have run out, but I'll give you another minute, Mr. Holland. With regard to the contention that there was no perception that she had a presenting problem related to her urinary tract, the mother not only advised the staff of this, but then the urinalysis was ordered with the ordering physician testifying that this was a test he would order for someone who is retaining urine. So can you tell me whether when the mother informs the personnel at Wishard about the problem, does she give any indication of how long this has been going on? Quote, she isn't urinating is not fully informative. Well, I think the deposition testimony was she hasn't been urinating. She hasn't been having any kind of bathroom functions. Is there any, like, for a day, for two days? Not in the chart. There's no reference to that. Okay. Yes. And the other point on perceiving that there was an issue relates to the fact that when they tried to get the sample, she wasn't able to urinate, which the nursing staff was advised of those circumstances. So there was an awareness of the urinary problem. Could I ask you Judge Rovner's question to Mr. Babb? That is, articulate the standard for us. The standard as it relates to screening is under EMTALA, the facility is required to use the procedures, protocols that it uses when a patient presents with similar complaints. That is standard. And the focus is on complaints rather than diagnoses? Well, it does focus on the presenting problem, one of which is the urinary tract. And then it looks to what does this facility normally do rather than malpractice the standard being not limited to this facility, but a more prevailing standard of care is what is done by reasonably prudent practitioners of the same specialty under similar circumstances. So you would get into correct versus incorrect diagnoses on the malpractice side versus just the, you know, what tests do we run? The tests have to be determined based on the initial presenting complaint. I mean, how would you know where to start? Could I ask just a very practical question here? Has the committee, the review committee, found a violation of the standard of care? Is that right? Yes, Your Honor. That often produces settlement discussions. Should we hold off? There have been no settlement discussions, and efforts have not been productive in that regard. We'll decide the case, but if there are settlement discussions, we'd want to know about that. Okay, I understand. Both sides. Okay. Thank you very much. All right. Thank you very much, Mr. Holland. Thank you, Mr. Babb. We will take the case under advisement.